991 So.2d 993 (2008)
Kim M. BALBONI and Richard W. LaRocque, Appellants,
v.
William Ronald LaROCQUE and Carole Torrance, Appellees.
No. 4D07-3991.
District Court of Appeal of Florida, Fourth District.
October 1, 2008.
Steven L. Brannock of Holland & Knight LLP, Tampa, and Robert E. Ferris, Jr., of Holland & Knight LLP, Fort Lauderdale, for appellants.
Michael L. Trop of Adorno & Yoss LLP, Fort Lauderdale, for appellees.
*994 STEVENSON, J.
Kim M. Balboni and Richard W. LaRocque appeal the probate court's final judgment admitting to probate the lost will of William R. LaRocque (Bill), the decedent. We hold that the evidence presented was legally insufficient to rebut the presumption of intentional revocation and reverse.
Bill LaRocque died in a nursing home in Broward County in 2006, at the age of 95. He was survived by two children, W. Ronald LaRocque (Ron) and Carole Torrance. He was predeceased by wife, Charlotte, who died nine months earlier, and son, Richard LaRocque, who died in 1993 and was survived by children, Kim Balboni and Richard W. LaRocque (Ricky). Thus, at the time of Bill's death, he had four lineal descendants who were heirs at law pursuant to section 731.201(18), Florida Statutes (2006): 1) son, Ron; 2) daughter, Carole; 3) granddaughter, Kim; and 4) grandson, Ricky.[1]
Bill and Charlotte executed estate planning documents on June 20, 2002. Pursuant to Bill's last will and testament, if he is predeceased by Charlotte, the will distributes his estate as follows: $50,000 to four named grandchildren, including Ricky; $10,000 to each surviving great-grandchild; and the remainder to children, Ron and Carole. The will expressly excludes grandchild, Kim, and her children. In 2004, at his parents' request, Ron retrieved their June 20, 2002 wills from a bank safety deposit box and left them with his parents at their home. After Bill's death, Ron searched the home and found a manila envelope that contained Charlotte's will, Charlotte's living will, and Bill's living will. Bill's last will and testament was never found. Ron and Carole filed the present petition for the establishment and probate of a copy of the lost will. They maintain that the will was accidentally lost or destroyed and that Bill did not intend to revoke it. Bill's grandchildren and heirs at law, Kim and Ricky, oppose the petition.
It is well-settled under Florida law that evidence that a testator's will was in his possession prior to death and cannot be located subsequent to death gives rise to a rebuttable presumption that the testator destroyed the will with the intention of revoking it. In re Estate of Carlton, 276 So.2d 832, 833 (Fla.1973); In re Estate of Parson, 416 So.2d 513, 517 (Fla. 4th DCA 1982) ("Revocation may be accomplished by the simple, quiet and unpublished act of throwing a will in the trash with the intention of revoking it."). In the present case, as it is undisputed that Bill was in possession of his will before his death and that the will could not be located after his death, the law presumes that Bill intentionally revoked his will. To avoid a finding of revocation, Ron and Carole, the proponents of the lost will, bear the burden of coming forward with competent substantial evidence that would justify a finding that the will had not been revoked. See In re Estate of Baird, 343 So.2d 41, 42-43 (Fla. 4th DCA 1977) (citing In re Estate of Washington, 56 So.2d 545 (Fla. 1952); In re Estate of Evers, 160 Fla. 225, 34 So.2d 561 (1948)). On appeal from a probate ruling, reversal is warranted if the findings of the probate judge are not supported by competent substantial evidence or the reviewing court finds that the probate judge misinterpreted the legal effect of the evidence as a whole. In re Estate of Evers, 34 So.2d at 562.
*995 Evidence that can serve to rebut the presumption of intentional revocation of a lost will consists of evidence that the will was either accidentally lost or destroyed, or willfully and fraudulently destroyed by an adverse party. Id. In several cases, Florida courts have found the presumption of intentional revocation to be rebutted by a showing of: 1) evidence that a person with an adverse interest, and the opportunity, may have destroyed the will, see In re Estate of Washington, 56 So.2d at 547; Lonergan v. Estate of Budahazi, 669 So.2d 1062 (Fla. 5th DCA 1996); Upson v. Estate of Carville, 369 So.2d 113 (Fla. 1st DCA 1979); 2) evidence that the will was accidentally destroyed, see In re Estate of Carlton, 276 So.2d at 833 (presumption was rebutted where decedent repeatedly spoke of his will and his intention to leave his estate to the petitioner, although the decedent's safe was found waterlogged and the papers inside turned to "mush"); 3) evidence that the original will had been seen among the decedent's papers after her death, see Silvers v. Estate of Silvers, 274 So.2d 20 (Fla. 3d DCA 1973); and 4) evidence that the decedent was insane and thus did not have testamentary capacity to effectively revoke the will, see In re Estate of Niernsee, 147 Fla. 388, 2 So.2d 737 (1941).
In the case at bar, the petitioners theorize that the will was accidentally lost or discarded due to increased traffic and paperwork in the home during Charlotte's illness. Petitioners stipulate that Kim and Ricky, the interested parties, had no opportunity to destroy the will; they submit that nurses and visitors, third parties who have no interest in the will, caused the will to be misplaced. The record establishes that Bill was a meticulous, secretive, and commanding businessman during his lifetime. For many years, Bill, who was prone to temper flare-ups, was not on speaking terms with Kim. Bill was generally fond of and trusted Ron. Bill and Charlotte always did their estate planning together and Bill executed various wills over the years that consistently excluded Kim. After the hearing, the probate court issued a lengthy order in which it analyzed the entirety of the evidence and held:
[T]he evidence presented as to decedent and Charlotte's long standing testamentary scheme, and the discord that existed between them and Kim, is sufficient to rebut the presumption and support the admission of the will to probate. However, as further evidence in support of overcoming the presumption, the Court finds that rather than being destroyed by decedent with the intent to revoke, it is more likely that the will was either lost among the papers written by the nurses who were in the house starting in January 2004, or was misplaced by decedent, or by Charlotte, or by one of the other newcomers in the house. The Court bases this conclusion on the fact that starting in January 2004, the amount of traffic in the house increased substantially, and the regular routine of the house was disrupted; that decedent and Charlotte always did their estate planning together; and that the Court believes it unlikely that Bill would have destroyed his will when Charlotte did not.
We find that the trial court misinterpreted the legal effect of the evidence and misapplied the presumption. In In re Estate of Baird, this court explained that the presumption of revocation gives rise to more than a "mere permissible inference of revocation." 343 So.2d at 42. Rather, the effect of the presumption is to require a finding of revocation, unless the proponents of the lost will offer evidence tending to show that the will had not been revoked. See id. at 43. In Baird, the decedent's will was missing from a box of his important papers at his death. Id. The decedent's *996 sister, the beneficiary under the will, offered evidence that the decedent's apartment had been open and accessible to unknown persons, the decedent expressed continued fondness for his sister and her son, and the decedent became forgetful toward the end of his life. Id. The Baird Court concluded that the sister's evidence was insufficient to rebut the presumption of intentional revocation. Id.
In the instant case, the evidence relied uponthe mirror-image wills of Bill and Charlotte, the decedent's longstanding testamentary scheme, the discord between the decedent and granddaughter Kim, and the presence of nurses and visitors in the homeis simply not sufficient to overcome the presumption that the decedent intentionally revoked his will at some point in time prior to his death. Since it was undisputed that Charlotte predeceased her husband, the evidence that her will was found is not material. Likewise, evidence of a decedent's fondness of someone or, in this case, a lack thereof, is not material to the question of revocation. See id. at 43. Further, the fact that people with no interest in the will had the opportunity to accidentally destroy it and "might possibly have done so obviously is no evidence whatever that they did." Id. We therefore conclude that here, as in Baird, the petitioners have failed to rebut the presumption of revocation with competent substantial evidence and instead have "presented no more than the fabled twins of speculation and conjecture to establish that [the decedent] might not have revoked his will." Id. at 43-44.
Reversed.
MAY, J., and LABARGA, JORGE, Associate Judge, concur.
NOTES
[1] Under Florida's intestacy laws, if there is no surviving spouse, property passes to the decedent's lineal descendants per stirpes. See §§ 732.103, 732.104, Fla. Stat. (2006). Accordingly, in the present case, since the decedent had three children, his two surviving children would each take 1/3 of the estate and the children of his predeceased son would split a 1/3 share.